UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

JOE COLEMAN,

                         Plaintiff,

              v.

HOME BOX OFFICE, INC. and HBO FILMS,

                        Defendants.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
18-CV-3510 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff Joe Coleman commenced the above-captioned action on June 15, 2018, against Defendants Home Box Office, Inc. and HBO films, alleging copyright infringement and contributory infringement pursuant to the Copyright Act, 17 U.S.C. § 101 *et seq.* (Compl., Docket Entry No. 1.) Plaintiff alleges that Defendants' use of his painting entitled *No One Can Enter the Lord's House Except as a Child (Slenderman)* (the "Work"), in a film entitled _*Beware the Slenderman* (the "Film") infringed upon his exclusive rights under the Copyright Act. (*See generally id.*) Plaintiff also alleges that "Defendants knew of and substantially participated in the unauthorized use of the Work by third parties." (*Id.*)

Currently before the Court is Defendants' motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiff's copyright infringement and contributory infringement claims. (Defs. Motion to Dismiss, Docket Entry No. 18; Mem. in Supp. of Defs. Mot. ("Defs. Mem.") 7, Docket Entry No. 18-1.) Defendants argue that their use of the Work constitutes fair use. (*Id.*) Plaintiff contends that Defendants' use of the Work is not protected by the fair use doctrine and argues that his contributory infringement claim cannot be decided on a

motion to dismiss.  (Pl. Resp. in Opp'n to Defs. Mot. ("Pl. Opp'n.") 8, 15, Docket Entry No. 20.)
For the reasons set forth below, the Court denies Defendants' motion as to Plaintiff's copyright
infringement claim and grants Defendants' motion as to Plaintiff's contributory infringement
claim.

### I.   Background

Plaintiff is a resident of Brooklyn, New York and is a "world-renowned painter, writer
and performer."[1]  (Compl. ¶ 7.)   Plaintiff has exhibited his work in major museums throughout
the world, and his ability to license his paintings for use in movies and television shows is an
important source of revenue.  (*Id*. ¶¶ 7, 8.)  Defendant Home Box Office, Inc. is "a premium
television network known for award-winning original movies, documentaries, and television
shows."  (Defs. Mem. 2.)  Defendant HBO Films is a division of Defendant Home Box Office,
Inc.  (Compl. ¶ 6.)

Under the United States Copyright Act, Plaintiff is the owner of the exclusive rights of
the Work, which is the subject of a valid Certificate of Copyright Registration issued by the
Register of Copyrights.  (*Id*. ¶ 17.)

In or around the fall of 2017, Plaintiff learned that Defendants featured the Work in the
Film.  (*Id*. ¶ 9.)  The Film has been distributed worldwide to more than 125 million subscribers
of HBO's satellite and cable television service and is also available on YouTube and other
Internet services.  (*Id*. ¶ 19.)  Defendants featured the Work in the Film without Plaintiff's
knowledge or consent.  (*Id*. ¶¶ 9, 17.)  According to Plaintiff, the Work is "very prominent," in
the Film and appears to be "intentional" as "[t]he camera focuses exclusively on the Work,

---

[1]  The Court assumes the truth of the factual allegations in the Complaint for the purposes
of this Memorandum and Order.

spending more than a minute scanning the intricate details of the painting from bottom to top, without alteration in full screen-focus." (*Id.* ¶ 10.)  In addition, the "documentary goes on to misrepresent Plaintiff's valuable painting as an example of 'Slenderman fan art' . . . [that is] readily available on the Internet." (*Id.*)

Plaintiff alleges that he "never authorized" Defendants' "commercial use of the Work" and that such use not only "usurped Plaintiff's exclusive right to license the Work for use in [the Film], it created the false impression that others can freely use the Work on the Internet and on commercial television without first getting permission." (*Id.* ¶ 14.)  As a result, "this false impression dramatically lessens the market for the Work" and by "misrepresenting Plaintiff's Work as an example of Internet 'fan art' Defendants induced, caused or materially contributed to infringement of the Work by third parties." (*Id.* ¶ 25.)  Because of Defendants' alleged infringement and contributory infringement, Plaintiff seeks an injunction enjoining Defendants from directly or indirectly infringing his rights and directing Defendants to "destroy all copies, in any and all media in which they exist, of Plaintiff's [Work] in Defendant[s'] possession, custody or control, including, without limitation, all existing copies of the Beware the Slenderman documentary and make all reasonable efforts to remove it from the market place." (*Id.* at 6.)  Plaintiff also seeks damages and attorneys' fees. (*Id.*)

On January 23, 2017, Defendants telecasted the Film.[2]  (Defs. Mem. 8.)  The subject of the Film is "the notorious attack by [A.W. and M.G.] on their friend and classmate [P.L.] . . . in the woods of Wisconsin," (the "Slenderman Case"). (*Id.*)  The Film recounts how A.W. and M.G. were apprehended and their admissions to the crimes, including statements to authorities

---

[2]  Plaintiff does not include a summary of the Film in his Complaint.  For the purpose of providing background with respect to the Film, the Court includes the background provided by Defendants in their memorandum of law in support of their motion to dismiss.

"that they believe[d] they needed to commit [a] murder to prove themselves to an Internet-based fictional character known as 'Slenderman' and become his 'proxies.'" (*Id.*) The Film tells the story of the Slenderman Case through A.W. and M.G.'s jailhouse interrogations, footage of courtroom testimony, and interviews with A.W. and M.G.'s family members and various experts. (*Id.*) The Film also discusses the Internet-based fictional character, Slenderman, a meme that has been "perpetuated through online forums, horror-focused websites, and social media, which has 'spread to every available platform and medium on the web.'" (*Id.*) In the course of the Film's discussion of Slenderman, the Film examines Slenderman and other internet-based characters' "effect on vulnerable adolescents." (*Id.* at 6.)

## II.  Discussion

### a.  Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

4

b.  **Fair use**

Defendants argue that the Court should dismiss the Complaint because Defendants' use of the Work "was transformative and a fair use."  (Defs. Mem. 7.)

In opposition, Plaintiff argues that Defendants, "[w]ithout bothering to seek permission or research the facts surrounding Plaintiff's painting . . . took an original work of art and used it in its entirety in a commercial film about the tragic story of two young girls and the Slenderman Internet meme."  (Pl. Opp'n. 7.)  Plaintiff argues that Defendants did not comment on the Work "or transform it in any way," and Defendants' "unauthorized use of the Work deprived Plaintiff of his exclusive right to license the painting for use in a commercial film and his right to deny permission to those who seek to misrepresent his work and thereby diminish its value."  (*Id.*)

"The law has long recognized that 'some opportunity for fair use of copyrighted materials' is necessary to promote progress in science and art."  *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016).  "The doctrine of fair use, derived from common law, is now codified in the Copyright Act of 1976, Pub. L. No. 94–553, 90 Stat. 2541."  *Id.* (citing 17 U.S.C. § 107).  Section 107 of the Copyright Act provides:

> [T]he fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include — (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit education purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107; *see Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 660 (2d Cir. 2018) (quoting 17 U.S.C. § 107).

"The determination of fair use is a mixed question of fact and law," *Swatch Grp. Mgmt.*
*Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014), and an "open-ended and context-
sensitive inquiry," *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006).  "Although defendants
bear the burden of proving that their use was fair, they need not establish that each of the facts
set forth in § 107 weighs in their favor." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476–77 (2d
Cir. 2004) (internal citation omitted).  "Courts most frequently address a proffered fair use
defense at summary judgment." *TCA Television Corp.*, 839 F.3d at 178; *see also Blanch*, 467
F.3d at 250 (explaining that courts may resolve fair use questions at summary judgment if there
are no genuine issues of fact).  Nevertheless, the Second Circuit "has acknowledged the
possibility of fair use being so clearly established by a complaint as to support dismissal of
a copyright infringement claim" at the motion to dismiss stage. *TCA Television Corp.*, 839 F.3d
at 178; *see Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013) (granting the defendant partial
summary judgment on fair use, but citing approvingly to a Seventh Circuit decision rejecting the
plaintiff's argument that fair use could not be decided at the motion to dismiss phase).  In some
cases, "the only two pieces of evidence needed to decide the question of fair use [are] the
original version" and the allegedly infringing work.  *Cariou*, 714 F.3d at 707
(quoting *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012)); *see*
*also Brownmark Films, LLC*, 682 F.3d at 690 (considering whether an episode of an animated
television show presented a parody of a viral internet video and viewing the two works side-by-
side); *BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 504 (S.D.N.Y.
2015) (stating that "it is possible to resolve the fair use inquiry on a motion to dismiss under
certain circumstances, but . . . there is . . . a dearth of cases granting such a motion").

The Court evaluates below the statutory fair use factors to determine whether

Defendants' use of the Work was fair.

### i.   Purpose and character of the use

"The first statutory fair use factor considers the purpose and character of the secondary use.  In this regard, the uses identified by Congress in the preamble to § 107 — criticism, comment, news reporting, teaching, scholarship, and research — might be deemed 'most appropriate' for a purpose or character finding [that is] indicative of fair use." *TCA Television Corp.*, 839 F.3d at 178 (citing *Authors Guild v. Google, Inc.*, 804 F.3d 202, 215 (2d Cir. 2015)); *see Google, Inc.*, 804 F.3d at 215 (noting that providing commentary or criticism on another's work is "[a]mong the best recognized justifications for copying").

### 1.   Plaintiff has plausibly alleged that Defendants' use is not transformative

In examining the first factor, "the primary inquiry is whether the use 'communicates something new and different from the original or [otherwise] expands its utility,' that is, whether the use is 'transformative.'" *Fox News Network, LLC v. Tveyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018) (quoting *Google, Inc.*, 804 F.3d at 214).  "To be transformative, a use must do something more than repackage or republish the original copyrighted work; it must add something new, with a further purpose or different character, altering the first with new expression, meaning or message." *Fox News Network, LLC*, 883 F.3d at 176 (alterations, citations, and internal quotation marks omitted); *see also Capitol Records, LLC*, 910 F.3d at 660 (stating that transformative means "that the use 'adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message,' rather than merely superseding the original work") (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)); *TCA Television Corp.*, 839 F.3d at 180 (stating that the Supreme Court "instructs that a court properly consider whether the new work merely supersedes the objects of the original

7

creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message"). "Uses that criticize, comment on, provide information about, or provide new uses for the copyrighted work are those likely to be deemed transformative." *Capitol Records, LLC*, 910 F.3d at 661.

The Second Circuit has noted that an infringing work does not need to comment on the original work in order to satisfy this first factor. *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 611 (2d Cir. 2006) (stating that a defendant is not required to discuss the artistic merits of the original image to satisfy the first factor of the fair use analysis); *see also Cariou*, 714 F.3d at 706 ("The law imposes no requirement that secondary work comment on the original or its author in order to be considered transformative, and a secondary work may constitute a fair use even if it serves some purpose other than those . . . identified in the preamble to the statute."). Some courts within the Second Circuit have found that "[d]ocumentaries and biographies fall within the protected categories of § 107, and are entitled to the presumption the use of the copyrighted material is fair." *Hofheinz v. Discovery Commc'ns, Inc.*, No. 00-CV-3802, 2001 WL 1111970, at *3 (S.D.N.Y. Sept. 20, 2001); *Monster Commc'ns, Inc. v. Turner Broadcasting System*, 935 F. Supp. 490 (S.D.N.Y. 1996) (finding that a documentary about Muhammad Ali was a biography and therefore "undeniably constitute[d] a combination of comment, scholarship and research, all of which enjoyed favored status under § 107").

The first statutory factor also requires courts to consider whether copyrighted materials are used for a commercial purpose or for a nonprofit educational purpose, "the former tending to weigh against a finding of fair use." *TCA Television Corp.*, 839 F.3d at 183 (citation and internal quotation marks omitted). "While the mere fact of a commercial motivation rarely pushes the first factor determination against fair use . . . in some circumstances a commercial motive will

weigh against a finding of fair use under Factor One." *Capitol Records, LLC*, 910 F.3d at 661.

"The less a use provides transformative value the more its commercialism will weigh against a

finding of fair use." *Id.* (citing *Campbell*, 510 U.S. at 579).

The parties disagree about whether Defendants' use of the Work is transformative.

Defendants argue that "by including an Internet image of the Work within a visual montage of

various works depicting the [Slenderman Case], the [Film] comments on the way that the girls'

crime has become part of the broader, ever-developing online mythology of Slenderman —

perversely achieving online what the girls can no longer accomplish in real life, their professed

goal . . . to 'always be together.'" (Defs. Mem. 11.)  In addition, Defendants argue that the Film

makes a "broader comment that the Internet poses a particular danger to at-risk children like

[A.W. and M.G.]." (*Id.*)  Defendants also argue that the Film does not "merely include the

Work; it comments on the fact that the Work is right there, on the Internet, along with other

Slenderman memes . . . for any at-risk young person to see." (*Id*. at 12.)

Plaintiff argues that the Film comments on the Slenderman Case and the mythology

surrounding it, which is also what the Work does, and therefore Defendants have used Plaintiff's

original work of art for precisely the same purpose for which it was created." (Pl. Opp'n 9–10.)

Further, Plaintiff argues that "[n]othing that . . . Defendants have done with the [Work] adds

anything new or 'imbues' it with a character different from that for which it was created." (*Id*. at

10.)  In response to Defendants' argument that they "included an Internet image of [the Work]

within a visual montage of various works depicting the [Slenderman case]," and did so to

comment on how the crimes committed by A.W. and M.G. have become part of the broader

online mythology of Slenderman, Plaintiff argues that the [I]nternet image of the Work used by

Defendants was unauthorized and that the Work is a physical painting and not part of an "ever-

developing online mythology."  (*Id*.)

Having reviewed[3] the Film and the Work and drawing all reasonable inferences in Plaintiff's favor, the Court is not persuaded that Defendants' use of the Work in the Film is transformative.  The mere fact that the Film is a documentary, which would arguably fall within one of the categories listed in section 107, *see Hofheinz*, 2001 WL 1111970, at *3 ("Documentaries and biographies fall within the protected categories of § 107"), is not enough to satisfy the first statutory fair use factor of the fair use inquiry, *see Shirman v. Whec-TV, LLC*, No. 18-CV-6508, 2019 WL 2163045, at *3 (W.D.N.Y. May 17, 2019) (noting that although the first factor presumably favored defendant because the defendant's work fell within one of the categories identified in section 107, "the use of copyrighted material that 'merely repackages or republishes the original is unlikely to be deemed a fair use,' even if it falls within one of the categories of section 107" (quoting *Fox News Network, LLC*, 883 F.3d at 177)).  The more significant inquiry is whether the new use is transformative.  *See Fox News Network, LLC*, 883 F.3d at 177.

 Defendants have made no changes to the Work.  The Work depicts A.W. and M.G. sitting or kneeling in front of Slenderman and includes text describing their crimes.  In the Film, the Work is featured for approximately twenty-five seconds and appears at the end of the Film following a series of images and animations depicting A.W. and M.G. committing their crimes

---

[3]  Because the Work and the Film are both incorporated by reference and integral to the Complaint, the Court may consider these items in deciding Defendants' motion to dismiss.  *See Hirsch v. Complex Media, Inc.*, No. 18-CV-5488, 2018 WL 6985227, at *2 (S.D.N.Y. Dec. 10, 2018) (noting that a photograph and video were both incorporated by reference and integral to the plaintiff's amended complaint and considering those items on a motion to dismiss).  Further, the Court is not required to accept the parties' characterizations of the Work and the Film, as "the works themselves supersede and control contrary descriptions of them" contained in the Plaintiff's pleadings or the parties moving papers.  *See Peter F. Gaito Architecture, LLC v. Simom Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010).

for Slenderman.  The Film includes a close-up shot of the Work, however, in the last few

seconds of the Work's display, the camera pans back to reveal that the Work is being viewed on

an Internet browser by an unknown individual on a computer.

A reasonable person could find that Defendants' use of the Work in the Film along with

Defendants' inclusion of an Internet browser adds something new that alters the purpose or

character of the Work and adds a new expression, meaning, or message.  *See TCA Television*

*Corp.*, 839 F.3d at 180.  However, while Defendants' stated purpose for the use of the Work is

plausible, it is not the only plausible explanation.  Defendants are not entitled to a finding that

their use of the Work is transformative solely because they display the Work in an Internet

browser.  *See id* at 182 (noting that a finding of fair use is not warranted solely "because [the]

defendants . . . place[d] the unaltered [r]outine in a sharply different context from its original

authors") (citing *Campbell*, 510 U.S. at 598); *see also Campbell*, 510 U.S. at 598 (observing that

courts should not afford fair use protection to persons who merely place characters from familiar

copyrighted works into novel or eccentric settings).  It is plausible that Defendants used the

Work in the Film solely as an illustrative aid depicting the subjects of the film, A.W., M.G., and

Slenderman.  This use would not be transformative.  *See Barcroft Media, Ltd. v. Coed Media*

*Grp., LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017) (stating that work is not transformative

where images are used simply as "illustrative aids" depicting the subjects described in a news

article).  Further, it is also plausible, as Plaintiff states in his opposition, that the Film uses the

Work to convey the same message and purpose that Plaintiff contemplated when creating the

Work, which would not constitute a transformative use.  *See Barcroft Media, Ltd.*, 297 F. Supp.

3d at 351 (finding that the first statutory fair use factor weighed strongly against the defendant

because the defendant displayed the plaintiff's images in the same manner and for the same

purpose as they were originally intended to be used).

Although Defendants argue that it is obvious that the "Work is . . . used as an example of the images that can now be seen on the Internet as part of the ever-evolving Slenderman myth, which has now grown to include [the girls]," (Defs. Mem. 18), the Court cannot conclude as a matter of law that it is, especially since, as Plaintiff notes in the Complaint and his opposition, the Work is a physical painting and not Internet art, (Pl. Opp'n 10).  Further development of the record is needed to clarify where Defendants obtained Plaintiff's work and to identify the intended purpose behind the Film's use of the Work and what, if any, new insights and understandings are created by Defendants' use.  *See Hirsch*, 2018 WL 6985227, at \*6 (denying the defendant's motion to dismiss because further development of the record was needed to clarify whether the defendant's use of a copyrighted photograph in a video created new insights and understandings).

### 2.   Defendants' use of the Work is commercial

Defendants do not appear to challenge that their use of the Work is commercial in nature. Instead, Defendants argue that their commercial use is not a dispositive factor in the Court's statutory fair use analysis.  (Defs. Mem. 9.)

Defendants use of the Work in the Film is undoubtedly for commercial purposes.  *See Arrow Prods., LTD. v. Weinstein Co. LLC*, 44 F. Supp. 3d 359, 370 (S.D.N.Y. 2014) (stating that the use of an allegedly infringing work has a commercial purpose "when a secondary user makes unauthorized use of copyrighted material to gain a profit through copying the original work"). However, Defendants correctly note that commercial uses are not presumptively unfair.  *See Cariou*, 714 F.3d at 708 ("[A]s the Supreme Court has recognized, Congress 'could not have intended' a rule that commercial uses are presumptively unfair." (citing *Campbell*, 510 U.S. at

584)).  The more transformative a new work is, the less significant the commercialism inquiry is to a finding of fair use.  *See Cariou*, 714 F.3d at 708 ("[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.").

In view of the Court's determination that Defendant's use of the Work in the Film cannot conclusively be deemed transformative as a matter of law, the Court concludes that at this stage of the litigation, the first statutory fair use factor does not weigh in Defendants' favor.

### ii.  Nature of the copyrighted work

"The second fair use factor concerns 'the nature of the copyrighted work.'"  *Capitol Records, LLC*, 910 F.3d at 661 (quoting 17 U.S.C. § 107(2)).  "This factor accounts for the fact that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  *Swatch Grp. Mgmt. Servs. Ltd.*, 756 F.3d at 87 (citations and internal quotations omitted).  Some courts have noted that works that are fictional or creative are "closer to the core of intended copyright protection," than works that are factual in nature.  *Google Inc.*, 804 F.3d at 220 (noting that under the second statutory fair use factor "courts have sometimes speculated that . . . a finding of fair use is more favored when the copying is of factual works than when copying is from works of fiction"); *see also Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014) (noting that "the law of fair use 'recognizes a greater need to disseminate factual works than works of fiction or fantasy'" (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985))); *Barcroft Media, Ltd.*, 297 F. Supp. 3d at 353 ("[C]opyrighted works that are creative or fictional are closer to the core of copyright, and therefore less likely to be fairly used, than works that are factual in nature." (citing *Campbell*, 510 U.S. at 586)).  However,

13

"[t]he mere fact that the original is a factual work . . . should not imply that others may freely copy it," as "authors of factual works, like authors of fiction, should be entitled to copyright protection of their protected expression." *Google, Inc.*, 804 F.3d at 220.  At the second step of the fair use analysis, courts "consider (1) whether the work is expressive or creative, . . . with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower."  *Cariou*, 714 F.3d at 709–10 (citations and internal quotation marks omitted).  This second factor "has rarely played a significant role in the determination of a fair use dispute."  *See Capitol Records, LLC*, 910 F.3d at 661–62 ("Except to the extent that the nature of the copyrighted work is necessarily considered alongside the character and purpose of the secondary use in deciding whether the secondary use has a transformative purpose, it rarely, by itself, furnishes any substantial reasoning for favoring or disfavoring fair use.").

Defendants argue that the second statutory fair use factor "should be neutral at most" and should not weigh heavily in the Court's analysis because the Work is creative and was already published.[4]  (Defs. Mem. 14.)

Plaintiff argues that the second factor of the fair use analysis "weighs heavily in [his] favor," because the Work, "an original work of visual art[,] . . . lies at the heart of copyright's intended protection."  (Pl. Opp'n 12.)

Defendants concede and there is no dispute that Plaintiff's Work is creative, (*see* Defs. Mem. 14 (noting that the Work is creative)), which weighs against a finding of fair use.

---

[4]  Without citing to any Second Circuit case law, Defendants also argue that the "the Work is at least partially derivative and entitled to less protection under the second factor."  (Def Mem. 14.)

However, the Court notes that this factor "rarely play[s] a significant role in the determination of a fair use dispute."  *Google, Inc.*, 804 F.3d at 220; *see Blanch*, 467 F.3d at 256 (explaining that the second factor is more likely to weigh against fair use where the work is "expressive or creative" rather than "factual or informational").  In addition, the parties do not dispute that the Work can be publicly viewed at www.joecoleman.com (the "Website"). [5]  Although the Work can be publicly viewed on the Website, the Second Circuit has declined to decide whether a work posted on the Internet should be characterized as "published," and instead has explained that "the fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors."  *Hollander v. Steinberg*, 419 F. App'x 44, 47 (2d Cir. 2011) (citing 17 U.S.C. § 107); *see id.* (stating that the plaintiff claimed that the district court mischaracterized his essays as "'published' simply because he posted them temporarily on his website," and declining to decide whether the essays were published and whether the second statutory fair use factor weighed in favor of either party).

Accordingly,  even though the Work is creative, the Court finds that the second statutory fair use factor favors neither party.  *See Michael Grecco Prods., Inc.*, 345 F. Supp. 3d at 507 (noting that the second factor did not weigh in either party's favor because the photograph in question was creative and published).

### iii.  Amount and substantiality of use

"The third factor considers 'the amount and substantiality of the portion [of the original] used in relation to the copyrighted work as a whole.'"  *Capitol Records, LLC*, 910 F.3d at 662 (quoting 17 U.S.C. § 107(3)).  In assessing this factor, a court must consider the "amount of

---

[5]  Plaintiff asserts that "[e]xamples of Plaintiff's artistic style can be viewed (but not copied or reused) at www.joecoleman.com."  (Pl. Opp'n 12.)

copyrighted material *made available to the public* rather than the amount of material *used by the copier*." *Fox News Network, LLC*, 883 F.3d at 179; *see Bill Graham Archives*, 448 F.3d at 613 ("We review this factor with reference to the copyrighted work, not the infringing work.").  In addition, a court must not only consider the amount of the copyrighted material used, but also the quality and importance of the material.  *See TCA Television Corp.*, 839 F.3d at 185 ("In assessing this factor, we consider not only 'the quantity of the materials used'" but also "their quality and importance.").  "[A] finding of fair use is more likely when small amounts, or less important passages, are copied than when the copying is extensive, or encompasses the most important parts of the original." *Google, Inc.*, 804 F.3d at 221.  However, "[c]omplete unchanged copying has repeatedly been found justified as fair use when the copying was reasonably appropriate to achieve the copier's transformative purpose and was done in such a manner that it did not offer a competing substitute for the original." *Id.*  The Second Circuit has held that copying an entire copyrighted work neither cuts in favor of fair use nor against fair use. *See Bill Graham Archives*, 448 F.3d at 613.  Instead, courts should "take into account that the extent of permissible copying varies with the purpose and character of the use." *Id.* (citing *Campbell*, 510 U.S. at 586–87).

Defendants argue that "the entirety of the Internet image of the Work was necessary to the Documentary's transformative use." (Defs. Mem. 15.)  In addition, Defendants argue that "the entire purpose of showing [the Work] — and to have the camera pull back from [the Work] so as to highlight [the Work's] place on the Internet — is to demonstrate the way that [A.W. and M.G.] have become a part of the visual, online narrative of Slenderman." (*Id.*)

Plaintiff argues that Defendants' argument fails because Plaintiff's painting is not Internet art. (Pl. Opp'n 13.)  Further, Plaintiff argues that "[b]ecause the [Work] was used in its

16

entirely and the use was not reasonable in light of the stated purpose," the third statutory fair use factor weighs in Plaintiff's favor.  (*Id*.)

In view of the Court's conclusion that Defendants' use of the Work in the Film cannot conclusively be deemed transformative as a matter of law, the Court finds that the third statutory factor of the fair use analysis, involving the amount and substantiality of the portion of the original used in relation to the copyrighted work, cannot be resolved on Defendants' motion to dismiss.  Central to this factor is a determination as to what Defendants sought to accomplish and the purpose served by including the Work in the Film.  *See N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 621 n.18 (S.D.N.Y. 2015) (stating that the third factor of the fair use analysis is dependent on the purported purpose of the copyrighted work's use, and declining to assess the third factor because an issue of fact existed as to the first factor).  Without further development of the record and resolution of these questions, the Court cannot determine whether Defendants' use of the entirety of the Work was necessary to further "the purpose and character of [Defendants'] use."  *Bill Graham Archives*, 448 F.3d at 613; *see May v. Sony Music Entm't*, No. 18-CV-2238, 2019 WL 2450973, at *14 (S.D.N.Y. Feb. 13, 2019) (declining to assess the third factor "without further development of the record examining what [the d]efendants sought to accomplish and how they did so"); *see also Hirsch*, 2017 WL 3393845, at *7 (finding that the complaint, the original work, and the infringing work "did not contain enough factual content to enable a solid assessment" of the first factor, therefore the court cold not assess the third factor of the fair use inquiry).

Accordingly, this factor weighs against a finding of fair use.

### iv.   Effect of use on potential market for copyrighted work

"The final statutory factor considers 'the effect of the use upon the potential market for or value of the copyrighted work.'"  *TCA Television Corp.*, 839 F.3d at 185 (quoting 17 U.S.C. § 107(4)).  This factor focuses on whether the secondary use of the copyrighted work "usurps demand for the protected work by serving as a market substitute."  *Id.*; *see also Campbell*, 510 U.S. at 592 (stating that the role of a court is to distinguish between "biting criticism that merely suppresses demand and copyright infringement, which usurps it" (alterations and internal quotation marks omitted)).  In weighing the fourth statutory fair use factor, a court must consider "not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original."  *Campbell*, 510 U.S. at 590.  In effect, the fourth factor "focuses on whether the copy brings to the marketplace a competing substitute for the original . . . so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original."  *Fox News Network, LLC*, 883 F.3d at 179 (quoting *Google Books*, 804 F.3d at 223).

The Second Circuit has instructed courts to consider not only the market harm caused by the alleged infringing action, but also the market harm that would result from "unrestricted and widespread conduct of the same sort."  *Id.* (alterations, citation, and internal quotation marks omitted).  Courts assessing the fourth statutory fair use factor must identify and weigh the relevant harm to the derivate market for a copyrighted work, "which market includes uses that creators of original works might 'license to others to develop.'"  *TCA Television Corp.*, 839 F.3d at 186 (quoting *Campbell*, 510 U.S. at 592); *see Am. Geophysical Union v. Texaco Inc.*, 60 F.3d

18

913, 929 (2d Cir. 1994) ("[T]he impact on potential licensing revenues is a proper subject for

consideration in assessing the fourth factor.").  "While derivative markets are not the principal

focus of the fourth inquiry, that does not mean that they are irrelevant."  *TCA Television Corp.*,

839 F.3d at 186.  In assessing harm posed to a licensing market a court should focus on the

"challenged use's impact on potential licensing revenues for traditional, reasonable, or likely to

be developed markets," and "not on possible lost licensing fees from [the] defendants'

challenged use."  *Id*.

Defendants argue that the final statutory fair use factor weighs in favor of a finding of fair

use because Plaintiff has not alleged any harm that is cognizable under the Copyright Act.  (Defs.

Mem. 16.)  In addition, Defendants argue that Plaintiff's allegation that Defendants "usurped

[his] exclusive right to license the Work for use in the [Film] and thereby deprived him of the

revenue from a potential license" would "if carried to its logical conclusion . . . eviscerate the

affirmative defense of fair use since every copyright infringer seeking the protection of the fair

use doctrine could have potentially sought a license from the owner of the infringed work."  (*Id*.

at 16.)

Plaintiff argues that he has alleged "the existence of both . . . traditional and derivative

markets for his work."  (Pl. Opp'n 14.)  He argues that he sells his original paintings for

"hundreds of thousands of dollars each and he licenses the copyrights for prints and other

reproductions."  (*Id*.)  Plaintiff argues that "[h]is paintings are regularly displayed in galleries

around the world and the ability to license them for use in movies is a vital piece of the economic

pie that belongs exclusively to him."  (*Id*.)  He further argues that, "unrestricted and widespread

conduct like that engaged in by [Defendants] would have substantial adverse effect on the

potential market for both his original work and derivative works."  (*Id*.)  In addition, Plaintiff

19

argues "that Defendant[s'] mischaracterization of the painting as [I]nternet art diminishes its market value." (*Id*. at 15.)

Plaintiff has sufficiently alleged the existence of a derivate market for his Work and market harm as a result of Defendants' use of his Work.  In the Complaint, Plaintiff alleges the existence of an active market for his art work as he notes that he has "exhibited his work for decades in major museums throughout the world." (Compl. ¶ 7.)  With respect to the existence of a derivative market, Plaintiff alleges that "licensing his paintings for use in movies and television shows is an important source of [his] revenue." (*Id*. ¶ 8.)  Further, Plaintiff "does not allege simply loss of revenue he would have earned from a compensated use, he alleges that his copyrighted painting was exploited by [Defendants] without paying the customary price." (Pl. Opp'n 15.)  Accepting these allegations as true, Plaintiff has sufficiently alleged the existence of a derivate market for his Work and market harm as a result of Defendants' use of his Work.  *On Davis v. The Gap, Inc.*, 246 F.3d 152, 175–76 (2d Cir. 2001), *as amended* (May 15, 2001) (finding that the fourth factor of the fair use analysis cut in favor of plaintiff where the defendants' use caused both loss of royalty revenue and "diminution of [owner's] opportunity to license to others who might regard [owner's] design as preempted by [the defendant's] ad").

 In response to Plaintiff's allegation that Defendants have harmed the market for the Work due to the Film's mischaracterization of the Work as "Slenderman fan art," Defendants correctly argue that any "harm stemming from what an allegedly infringing work said about the work is not cognizable under the Copyright Act." (Defs. Mem. 17 (citing *New Era Publ'n Int'l, Aps v. Carol Publ'g Grp.*, 904 F.2d 152, 160 (2d Cir. 1990)); *see New Era Publ'n Int'l, Aps*, 904 F.2d at 160 ("[C]onvincing the public that the original work was of poor quality is not within the scope of copyright protection." (internal quotation marks omitted)).  Nevertheless, Plaintiff's

allegations with respect to the derivative market for the Work and the harm Defendants have caused to the derivative market is sufficient to find that the fourth statutory fair use factor weighs against a finding of fair use.  *See TCA Television Corp.*, 839 F.3d at 186 (noting that the district court disregarded the potential for derivative market harm and finding that the fourth factor of the fair use analysis weighed in favor of the plaintiffs because the plaintiffs alleged that they received regular requests to license their routine and frequently granted those requests).

In sum, at this stage of the litigation, three of the four statutory fair use factors weigh against a finding of fair use and one statutory fair use factor does not weigh in favor of either party.  Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's copyright infringement claim.

### c.  Contributory infringement

Defendants also move to dismiss Plaintiff's claim for contributory infringement.  (Defs. Mem. 18.)

"[A]lthough '[t]he Copyright Act does not expressly render anyone liable for infringement committed by another . . . it is well established, based on the common-law doctrine that . . . one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a contributory infringer." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117–18 (2d Cir. 2010) (alterations, citations, and internal quotation marks omitted); *see Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 40 (2d Cir. 2005) (same).  In order for a defendant to be held liable for contributory infringement, a direct infringement must have occurred.  *See Faulkner*, 409 F.3d at 40 ("[T]here can be no contributory infringement absent actual infringement."); *see also Russian Entm't Wholesale, Inc. v. Close-Up Int'l, Inc.*, 482 F. App'x 602, 606 (2d Cir. 2012) (finding that

plaintiff's contributory infringement claim failed because there was no secondary infringement); *Wolk v. Kodak Imaging Net., Inc.*, 840 F. Supp. 2d 724, 750 (S.D.N.Y. 2012), *aff'd sub nom*, 569 F. App'x 51 (2d Cir. 2014) ("[T]o hold a defendant secondarily liable someone else must have directly infringed on the copyright holder's rights.").

Plaintiff has failed to state a claim for contributory infringement. Plaintiff alleges that through Defendants' use of the Work in the Film, Defendants "created the false impression that others can freely use the Work on the Internet and on commercial television without first getting permission." (Compl. ¶ 14.) Plaintiff also alleges that by "misrepresenting Plaintiff's Work as an example of Internet 'fan art' Defendants induced, caused or materially contributed to infringement of the Work by third parties." (*Id.* ¶ 25.)

As argued by Defendants, Plaintiff fails to sufficiently allege infringement by a third party. *See Wolk*, 840 F. Supp. 2d at 750  ("[I]n order to hold a defendant secondarily liable someone else must have directly infringed on the copyright holder's rights."); *Matthew Bender & Co.*, 158 F.3d at 706 (same). Plaintiff's argument that the Website showcasing the Work that Defendants used in the Film represents an example of a "direct infringement by a third party for which . . . [D]efendant[s] [are] . . . responsible," is unpersuasive. (Pl. Opp'n 15.) The Website cannot be deemed a third-party infringer, as both parties concede that the Website's use of the Work predated Defendant's own use. Further, Plaintiff's allegation that Defendants "created the false impression that others can freely use the Work on the Internet and on commercial television without first getting permission," is insufficient to establish a claim for contributory infringement. *See Wolk*, 840 F. Supp. 2d at 750 ("An allegation that a defendant 'merely provid[ed] the means to accomplish an infringing activity is insufficient to establish a claim for contributory infringement." (citation omitted)); *see also Quiroga v. Fall River Music, Inc.*, No.

93-CV-3914, 1998 WL 851574, at *37 (S.D.N.Y. Dec. 7, 1998) ("A mere allegation that the defendant provided the third party with the opportunity to engage in wrongful conduct would not even be enough to survive a motion to dismiss.").

Accordingly, the Court grants Defendants' motion as to Plaintiff's contributory infringement claim.

**III. Conclusion**

For the foregoing reasons, the Court denies Defendants' motion to dismiss Plaintiff's copyright infringement claim and grants Defendants' motion to dismiss Plaintiff's contributory infringement claim.

Dated: August 6, 2019
      Brooklyn, New York

                              SO ORDERED:


                              _____s/ MKB_____
                              MARGO K. BRODIE
                              United States District Judge